AES: NR/HM
F.#2020R00338

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X

| | |
|---|---|
| UNITED STATES OF AMERICA | To Be Filed Under Seal |
| - against - | COMPLAINT AND AFFIDAVIT IN SUPPORT OF APPLICATION FOR ARREST WARRANTS |
| KENT BULLOCH and WILLIAM YOUNG, SR.,    also known as "Bill," | (T. 18 U.S.C. § 371) |
|           Defendants. | No. 20-MJ-327 |

----------------------------------------------------X

EASTERN DISTRICT OF NEW YORK, SS:

WILLIAM BOLINDER, being duly sworn, deposes and says that he is a

Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to

law and acting as such.

1.      In or about and between March 2020 and April 2020, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants KENT BULLOCH and WILLIAM YOUNG, SR., also known as "Bill," together

with others, did knowingly and intentionally conspire to accumulate, for the purpose of resale

at prices in excess of prevailing market prices, materials which have been designated by the

President as scarce materials or materials the supply of which would be threatened by such

accumulation, to wit: certain personal protective equipment ("PPE"), including KN95

Filtering Facepiece Respirators (the "KN95 Masks") and 3-Ply surgical masks (the "3-Ply

Masks"), contrary to Title 50, United States Code, Section 4512.

2.     In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants KENT BULLOCH and WILLIAM YOUNG, SR., together with others, did commit and cause to be committed, among others, the following:

OVERT ACTS

(a)     On April 21, 2020, YOUNG communicated via text message to a potential investor located in the Eastern District of New York about an opportunity to make money involving the sale of PPE.

(b)     On or about April 22, 2020, BULLOCH transmitted an email to an individual located in the Eastern District of New York attaching an "escrow agreement" that was designed to conceal the price gouging conspiracy from purchasers of PPE.

(c)     On or about April 22, 2020, YOUNG transmitted an email to an individual located in the Eastern District of New York providing bank account information and wiring instructions to facilitate payments for the sale of PPE.

(d)     On or about April 23, 2020, BULLOCH transmitted an email to an individual located in the Eastern District of New York attaching an executed copy of an "escrow agreement" that was designed to conceal the price gouging conspiracy from purchasers of PPE.

(Title 18, United States Code, Section 371)

The source of your deponent's information and the grounds for his belief are as follows:

3.     I am a Special Agent with the FBI, and have been in that position for more than one year.  I am currently assigned to a squad involved in investigating violations of

securities laws as well as mail and wire fraud statutes, among other crimes.  In the course of

my work for the FBI, I have received training regarding the securities industry and financial

fraud, as well as training regarding the means by which proceeds of such fraud may be

laundered to conceal its origins and to recycle those proceeds in such a way as to continue the

fraudulent activities that generated them.

4.      I have personally participated in the investigation of willfully hoarding

designated scarce materials by the defendants KENT BULLOCH and WILLIAM YOUNG,

SR., as discussed below.  I am familiar with the facts and circumstances of this investigation

from, among other things: (a) my personal participation in this investigation, (b) discussions

with other law enforcement agents involved in this investigation and (c) my review of

evidence including consensual recordings, emails and bank records as discussed below.

5.      Except as explicitly set forth below, I have not distinguished in this

affidavit between facts of which I have personal knowledge and facts of which I learned from

other law enforcement agents.  Because this affidavit is being submitted for the limited

purpose of establishing probable cause to arrest the defendants KENT BULLOCH and

WILLIAM YOUNG, SR., I have not set forth each and every fact learned during the course of

this investigation.  Instead, I have set forth only those facts that I believe are necessary to

establish probable cause for the arrest warrants sought herein.  In addition, where the contents

of documents, or the actions, statements and conversations of others are reported herein, they

are reported in sum and substance and in part, except where otherwise indicated.  Summaries

of recorded conversations are based upon draft transcripts of the conversations, which are

subject to revision.

<u>The COVID-19 Outbreak and the Defense Production Act</u>

6.      In December 2019, a novel coronavirus, SARS-CoV-2 (the
"coronavirus"), was first detected in Wuhan, Hubei Province of the People's Republic of
China ("PRC"), causing outbreaks of the coronavirus disease COVID-19 that have since
spread globally.  On January 31, 2020, the Secretary of Health and Human Services ("HHS")
declared a national public health emergency under 42 U.S.C. § 247d as a result of the spread
of COVID-19 to and within the United States.  On March 11, 2020, the Director-General of
the World Health Organization ("WHO") characterized COVID-19 as a pandemic.  On March
13, 2020, the President of the United States issued Proclamation 9994 declaring a national
emergency beginning on March 1, 2020, as a result of the rapid spread of COVID-19 within
the United States.

7.      According to the Centers for Disease Control and Prevention ("CDC"):

Early reports suggest person-to-person transmission most
commonly happens during close exposure to a person infected
with COVID-19, primarily via respiratory droplets produced
when the infected person coughs or sneezes.  Droplets can land
in the mouths, noses, or eyes of people who are nearby or
possibly be inhaled into the lungs of those within close
proximity.[1]

8.      Accordingly, CDC has issued guidance to health care providers
recommending that they wear personal protective equipment ("PPE") to prevent the
coronavirus from being transmitted by infected patients to healthcare providers.

---

[1]      See CDC, "Interim Infection Prevention and Control Recommendations for Patients
with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare
Settings," https://www.cdc.gov/coronavirus/2019-ncov/infection-control/control-
recommendations.html

- 4 -

9.      As COVID-19 spreads across the United States, it threatens to overwhelm hospitals and healthcare providers who are required to care for rapidly increasing numbers of seriously ill patients with a rapidly dwindling stock of PPE and other necessary health and medical resources.  Accordingly, on March 18, 2020, the President of the United States issued Executive Order 13909, see 85 Fed. Reg. 16,227, invoking the powers vested in the President by the Defense Production Act of 1950, 50 U.S.C. §§ 4501 et seq. (the "Act").

10.      The Act authorizes the President to, among other things, "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense."  50 U.S.C. § 4511(a)(2).  The President may exercise this authority "to control the general distribution of any material in the civilian market" only if the President finds "(1) that such material is a scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship."  50 U.S.C. § 4511(b).

11.      "In order to prevent hoarding," the Act further provides that "no person shall accumulate (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation."  50 U.S.C. § 4512.  The Act requires the President to publish in the Federal Register "every designation of materials the accumulation of which is unlawful and any withdrawal of such designation," and authorizes the President to "prescribe such conditions with respect to the accumulation of materials in

excess of the reasonable demands of business, personal, or home consumption as he deems necessary to carry out the objectives of this chapter." Id.

12.     In Executive Order 13909, the President found "that health and medical resources needed to respond to the spread of COVID-19, including personal protective equipment and ventilators, meet the criteria specified in section 101(b) of the Act (50 U.S.C. 4511(b))."  The President further delegated authority to the Secretary of HHS to "identify additional specific health and medical resources that meet the criteria of section 101(b)."

13.     On March 23, 2020, the President issued Executive Order 13910, see 85 Fed. Reg. 17,001, declaring that:

> To ensure that our Nation's healthcare systems are able to surge capacity and capability to respond to the spread of COVID-19, it is the policy of the United States that health and medical resources needed to respond to the spread of COVID-19, such as personal protective equipment and sanitizing and disinfecting products, are not hoarded.

14.     Accordingly, the President delegated to the Secretary of HHS the President's authority under 50 U.S.C. § 4512 "to prevent hoarding of health and medical resources necessary to respond to the spread of COVID-19 within the United States," and "to implement any restrictions on hoarding."

15.     On March 25, 2020, the Secretary of HHS exercised the authority delegated to the Secretary of HHS by the President to prevent the hoarding of health and medical resources necessary to respond to the spread of COVID-19 within the United States. The Secretary of HHS published a notice, see 85 Fed. Reg. 17592, designating the following health and medical resources under the Act as scarce materials or materials the supply of which would be threatened by accumulation in excess of reasonable demands of business,

- 6 -

personal, or home consumption, or for the purpose of resale at prices in excess of prevailing

market prices:

    a.  N-95 Filtering Facepiece Respirators

    b.  Other Filtering Facepiece Respirators (e.g., those designated as N99, N100, R95, R99, R100, or P95, P99, P100)

    c.  Elastomeric, air-purifying respirators and appropriate particulate filters/cartridges

    d.  Powered Air Purifying Respirator (PAPR)

    e.  Portable Ventilators

    f.  Chloroquine phosphate or hydroxychloroquine HCl

    g.  Sterilization services for certain medical devices and certain sterilizers

    h.  Disinfecting devices and other sanitizing and disinfecting products suitable for use in a clinical setting

    i.  Medical gowns or apparel, e.g., surgical gowns or isolation gowns

    j.  Personal protective equipment (PPE) coveralls, e.g., Tyvek Suits

    k.  PPE face masks

    l.  PPE surgical masks

    m. PPE face shields

    n.  PPE gloves or surgical gloves

    o.  Ventilators, anesthesia gas machines modified for use as ventilators, and positive pressure breathing devices modified for use as ventilators, ventilator tubing connectors, and ventilator accessories.

16.     Despite these efforts, the news media has regularly reported on the

widespread shortages of PPE and other healthcare and medical supplies needed to respond to

the spread of COVID-19.  In addition, the news media has reported that the serious shortage

of N95 Masks prompting brokers to approach hospitals, medical supply companies and

healthcare providers claiming to be able to obtain supplies of N95 Masks at prices as high as

between $4.00 and $9.00 per mask, far in excess of the $0.75-to-$1.00-per-mask price that

prevailed in the market before COVID-19 began to spread widely in the United States.

17.     During the course of this investigation, the undersigned has spoken with

a representative of 3M.  3M is an international corporation that, according to its website, is

now manufacturing nearly 100 million N95 Masks per month worldwide and has done so

without increasing its prices.  The 3M Representative stated that prior to COVID-19 pandemic, 3M did not import or sell any KN95 Masks in the United States because the KN95 Masks had not been approved by the appropriate regulatory agencies for sale in the United States.  As such, a historic pricing comparison for the KN95 Mask prior to the pandemic is difficult.   Nonetheless, since in or around early April 2020, KN95 Masks have been approved for sale within the United States and 3M began sale thereof directly to FEMA.  The representative further indicated 3M has designated benchmark prices that are being used to value the price for which 3M KN95 Masks should sell.  For example, if 3M were to sell its 9552 model KN95 Mask to a single small volume purchaser, the mask would sell for approximately $0.84.  If 3M were to sell, for example, one million of these KN95 Masks to a wholesaler, the sale price would be much less than $0.84 per mask.  The representative further indicated that the benchmark prices for various models of KN95 Masks provided by 3M were within the range of $0.61 - $0.84 per mask (or less).  A KN95 Mask qualifies as either a filtering facepiece respirator and/or "PPE facemask" under the terms of 85 Fed. Reg. 17592.

18.     Based on a source who works at a Los Angeles area health clinic and who spoke with a hospital procurement officer and reviewed relevant invoices, 3-Ply Masks similar to the masks involved in this investigation could be purchased by hospitals within the Los Angeles area for approximately between $0.14 and $0.18 each before the COVID-19 pandemic.  Based on my training and experience I know that typical wholesale prices for items, such as masks, are significantly lower than retail prices paid by the end user, such as a hospital.  A 3-Ply Mask qualifies as either a filtering facepiece respirator and/or "PPE facemask" under the terms of 85 Fed. Reg. 17592.

19.     The Defense Production Act makes the willful performance of any act prohibited by Section 4512, "or any rule, regulation or order thereunder," a crime punishable by a fine of not more than $10,000 or imprisonment for not more than one year.  50 U.S.C. § 4513.  Accordingly, willfully accumulating designated scarce or threatened materials either (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, is a criminal offense.

<u>The Defendants</u>

20.     The defendant KENT BULLOCH was a businessman and attorney in northern California.

21.     The defendant WILLIAM YOUNG, SR. was a businessman in Arizona.

<u>Initial Investigation</u>

22.     On March 26, 2020, the defendant WILLIAM YOUNG, SR. called a potential investor ("Investor-1")[2] about an opportunity involving 40 million N95 Masks and indicated that the masks could be sold for double or triple the purchase price.  Investor-1 was located in the Eastern District of New York at the time and had received numerous fraudulent investment proposals from YOUNG in the past, including a "safe" investment purporting to return profits of 200% per month.  Investor-1 alerted the government to potential criminal activities and agreed to assist in this investigation.[3]

---

[2]     Investor-1 has previously been convicted of federal securities fraud and cooperated with government.  Investor-1 served the sentence imposed by the court in that case and is no longer under court supervision.

[3]     Investor-1 and Investor-2, identified below, took all of the actions described herein at the direction of the government.

23.     On March 27, 2020, the defendant WILLIAM YOUNG, SR. sent an email to Investor-1 regarding the potential purchase of the 40 million N95 Masks, which appeared to contain materially false information designed to fraudulently induce Investor-1 and others to invest money.  Specifically, the email attached a brochure (the "Brochure") that contained purported certifications for the masks, including one referencing certification standard "BS EN 14683:2019" (the "Compliance Certificate").  The bottom of the Compliance Certificate stated: "The validity of this certificate can be verified at www.bqccert.com or through info@bqccert.com.  This certificate is the property of BQC certifications and must be returned on request.  Accreditation details are available with IAS (International Accreditation Service) Inc. USA, at www.iasonline.org."[4]

24.     The Brochure also had numerous typographical errors, several instances of missing spaces or extra spaces between words, and stamps, logos, and signatures on the Compliance Certificate (and other certificates) that appear to be low-resolution images contained within an otherwise high-resolution document.  Based on my training and experience, I believe that this indicates that the Compliance Certificate and other certificates in the Brochure had been altered.

---

[4]     On or about March 28, 2020, FBI special agents interviewed the president of International Accreditation Service ("IAS").  After having reviewed the Brochure, the IAS President provided the following information: (1) IAS was unable to locate the number listed on the Compliance Certificate; (2) the statement "Accredited by International Accreditation Service" at the bottom of the Compliance Certificate was false and misleading because IAS had nothing to do with certifying anything in this certificate;(3) the Compliance Certificate failed to state BQC's address as required by IAS standards; and (4) based on the foregoing information, the IAS President believed the Brochure to be an invalid document.

25.     On March 27, 2020, Investor-1 introduced the defendant WILLIAM YOUNG, SR. to an individual identified as a representative of wealthy investors ("Investor-2")[5].  YOUNG in turn introduced the defendant KENT BULLOCH, an attorney acting as the "pay master,"[6] and two European businessmen who offered to sell millions of masks located in various countries for prices as high as $7.00 per mask but ultimately advised that these masks were no longer for sale.

26.     On April 9, 2020, during a recorded call,[7] Investor-2 spoke with the defendants KENT BULLOCH and WILLIAM YOUNG, SR. about the various offers made by the European businessmen.  YOUNG advised that the European businessmen did not have any masks.  BULLOCH then said that he had an alternate supply of protective masks that were in the United States.  In a call that later day, BULLOCH told Investor-2, in sum and substance and in part, that there were 1 million 3M KN95 Masks and 11 million 3-Ply Masks for sale and located in Los Angeles, California.  In another call that day, BULLOCH indicated that he had spoken to a supplier who had 1 million masks in Los Angeles for sale at $3.80 per unit.  He further indicated that the masks were available in the supplier's physical possession "this minute" and that the masks were the "3M 95" masks.  BULLOCH then promised to obtain additional information from the supplier, who he identified as someone

---

[5]     Investor-2 has pleaded guilty to federal felony charges and is cooperating in hopes of receiving a reduced sentence.  Investor-2 has previously proven reliable and information Investor-2 has provided has been corroborated by independent sources, including documentary evidence and other, unrelated, witnesses.

[6]     Based on the investigation, I understand that as the "pay master," the defendant KENT BULLOCH was responsible for facilitating the payment of funds from the buyer of PPE to the seller and also for distributing any commission fees owed to any brokers involved in the transaction.

[7]     All calls referenced herein were recorded.

that he had worked with for "fourteen years."  BULLOCH also indicated that his supplier had

11 million "smaller masks" (3-Ply Masks) for $0.74 per mask.

Investigation of Supplier-1 and Supplier-2

27.     On April 9, 2020, the defendant KENT BULLOCH introduced Investor-

2 to an individual who was purported to own masks in the Los Angeles area ("Supplier-1").[8]

Supplier-1 informed Investor-2 that he had been doing "spot buys" of protective masks and

"flipping" the purchased masks.  Based on my training and experience, I understand "spot

buying" is the practice of buying to meet immediate requirements, rather than for stock or to

meet future demand.  Supplier-1 further indicated that he had been purchasing masks for

approximately $2.50 per KN95 Mask two weeks prior and that prices were jumping up to

$3.25 per KN95 Mask.  Investor-2 then inquired as to how much Supplier-1 was charging

when Supplier-1 sold the masks.  Supplier-1 informed Investor-2 that Supplier-1 had

previously told BULLOCH that the price was $3.80 per KN95 Mask.

28.     Later that day, April 9, 2020, the defendant KENT BULLOCH sent an

email to Investor-2,[9] stating:

> It was my pleasure to speak with you and [Supplier-1] regarding
> the availability of the KN95 and 3 ply masks for your client.
> The price for the KN95 mask, FOB Los Angeles with
> availability of 1 million masks on Monday, April 13, 2020.  The
> 3 Ply masks are available for .75 cents per mask, with 11 million
> available FOB Los Angeles.

---

[8]     On April 22, 2020, the Honorable Roanne L. Mann signed arrest warrants for
Supplier-1 and Supplier-2, as identified below, based on a complaint, related to this
investigation, charging them with conspiracy to commit wire fraud in violation of 18 U.S.C. §
1349.  (20-MJ-318).

[9]     All of the emails referenced herein that were received or sent by Investor-2 were
routed through a server maintained by Investor-2 and located within the Eastern District of
New York.

In that email, BULLOCH provided wiring information for his trust account (the "Trust Account") and "highly recommend[ed]" to Investor-2 that Investor-2 place the total purchase price for the masks into escrow in the Trust Account.[10]

29.     On April 10, 2020, Investor-2 spoke with the defendant KENT BULLOCH on two occasions via telephone.  During these calls, BULLOCH again suggested that Investor-2 "reserve" masks by depositing money into the Trust Account controlled by BULLOCH.

30.     On Saturday, April 11, 2020, Investor-2 received a telephone call from Supplier-1.  During the call with Investor-2, Supplier-1 told Investor-2 that he had 20,000 KN95 Masks at a warehouse in Santa Ana, California, which was near his office.  Supplier-1 further stated that he had another 11 million 3-Ply Masks in El Monte, California, but that the warehouse where they were located was closed for the weekend, and Supplier-1 had not had a chance to view the 3-Ply Masks.  Investor-2 informed Supplier-1 that his associate would be in touch with Supplier-1 to discuss logistics.  In fact, the associate was a law enforcement agent acting in an undercover capacity ("UC-1").

31.     Between April 11, 2020 and April 14, 2020, Supplier-1 was in repeated contact with UC-1.

32.     On April 14, 2020, Supplier-1 and an associate of Supplier-1 ("Supplier-2") met UC-1 at an address for the "auxiliary office" (the "Office"), a single-family residence in Rancho Cucamonga, California.

---

33.     During the meeting at the Office, UC-1, Supplier-1 and Supplier-2 discussed, in sum, substance and part, their business and the fact that they had successfully completed multiple deals selling PPE.  Both men repeatedly stated that the protective masks sold very quickly.  Supplier-1 also stated that he and Supplier-2 had $24 million "on the way" for masks and that the money was currently on hold in the defendant KENT BULLOCH's account.  Supplier-1 and Supplier-2 also explained that they were "spot buying" masks and reselling them.

34.     During the meeting, UC-1 explained that the buyer represented by Investor-2 was going to "add a dollar" to the KN95 Masks and resell them to another individual.

35.     Supplier-2 and UC-1 then departed the Office and headed to a large warehouse in Rancho Cucamonga, California (the "Rancho Cucamonga Warehouse").  At the Rancho Cucamonga Warehouse, UC-1 was shown numerous boxes and was told that the boxes contained 500,000 3-Ply Masks.  UC-1 was also informed that another 2 million 3-Ply Masks were located in the Rancho Cucamonga Warehouse in an area that was currently inaccessible.

36.     Supplier-2 and UC-1 then travelled to a second warehouse in downtown Los Angeles (the "LA Warehouse").  At the LA Warehouse, Supplier-2 showed UC-1 a large number of boxes and advised UC-1 that the boxes contained a total of approximately 1.2 million 3-Ply Masks.  At the LA Warehouse, Supplier-2 told UC-1 that they had a large inventory of KN95 Masks and that they could hold 500,000 KN95 Masks for Investor-2.

Communications During and After UC-1 Meeting

37.     On April 14, 2020, at about 11:40 a.m.,[11] at approximately the same time that UC-1 and Supplier-2 were concluding their visit to the Rancho Cucamonga Warehouse, the defendant KENT BULLOCH called Investor-2.  BULLOCH explained that the invoice "just came in," that Supplier-1 had met with UC-1 and that UC-1 "verified everything."  BULLOCH said, "if it's a go, move the money and we'll take care of it.  And if not, let me know, because there is a line."

38.     At about 11:48 a.m., Supplier-1 emailed Investor-2 an invoice from ICIG for 2,500,000 "3 ply Face masks Respirators" at $0.74 each, for a total of $1,850,000. The note section of the invoice stated: "Please remit payment to the Law Offices of Kent Bulloch."

39.     At about 12:18 p.m., the defendant WILLIAM YOUNG, SR. sent a text message to Investor-2, asking for a call to discuss commission payments.

40.     At about 12:20 p.m., Investor-2 called the defendants KENT BULLOCH and WILLIAM YOUNG, SR.  BULLOCH said that he, YOUNG and Investor-2 had not discussed what commission they would charge.  YOUNG said he thought they had agreed to a 10% commission but wanted to make sure everyone was on the same page. BULLOCH then suggested that they add $0.02 per mask to the invoice and split this commission three ways.  YOUNG suggested adding 10% to the $3.80 price of the "big masks" (the KN95 Masks) for a total price of $4.18.   BULLOCH said he wanted to discuss only the "little masks" (the 3-Ply Masks) "on the table today," that is, the 2.5 million 3-Ply

---

[11]     Unless otherwise indicated, all times set forth herein are Pacific Standard Time.

Masks.  Investor-2 again represented that the person he was buying for intended to add $.50 or $1.00 to each 3-Ply Mask and "flip them."  BULLOCH explained that he could add a commission to the invoice by simply calling Supplier-1 and having the invoice include the commission going to BULLOCH, YOUNG and Investor-2.  BULLOCH then suggested: "Just let me know, because I will get it put on the invoice and that way you don't even have to answer questions."  Based on my training and experience, I believe that BULLOCH was suggesting that commissions be added to the invoice price for the 3-Ply Masks so as to conceal those commissions, including Investor-2's proposed commission, from the buyer represented by Investor-2.

41.     At about 2:37 p.m., after a call between Investor-2, Supplier-1 and Supplier-2 in which Investor-2 indicated an intent to purchase the 3-Ply Masks and KN95 Masks, Supplier-1 sent another email to Investor-2, copying the defendant KENT BULLOCH, providing invoices for (1) 2,500,000 3-Ply Masks for $0.76 each; (2) 500,000 KN95 Masks at $3.80 each; and (3) 1,300,000 3-Ply Masks at $0.76 each.  Each of the invoices contained the following note: "Please pay to the Law Offices of Kent Bulloch."

42.     On April 15, 2020, at about 9:40 a.m., Supplier-1 sent another email to Investor-2, copying the defendant KENT BULLOCH, with the subject line: "KN95 Invoice." Supplier-1 wrote, "Gentlemen, Here is the KN95 Invoice."  Attached to the email was one invoice from International Commerce and Investment Group Inc. ("ICIG")[12] to the buyer represented by Investor-2 for 500,000 KN95 Masks for $3.90 each, for a total of $1,950,000. The invoice again contained the following note: "Please remit payment to the Law Offices of

---

[12]     ICIG was a company incorporated in California in September 2017 of which Supplier-1 and Supplier-2 were officers.

Kent Bulloch."  I believe that the quoted price of $3.90 represents the original price of $3.80

plus a $0.10 per mask commission to be split by BULLOCH and the defendant WILLIAM

YOUNG, SR.

43.     Later that day, at about 5:12 p.m., Investor-2 called Supplier-1.

Investor-2 explained that he was getting ready to send a wire for $4,838,000 but wanted

assurances that Supplier-1 had the authority to sell the 2.5 million 3-Ply Masks, the 1.3

million 3-Ply Masks and the 500,000 KN95 Masks reflected in the invoices.  Supplier-1

confirmed, in sum and substance, that he had such authority.  As set forth below, Supplier-1,

Supplier-2 and/or ICIG did not have a contract or agreement with the owners of the masks,

and statements about a contract or agreement were made to fraudulently induce Investor-2 to

wire $4,838,000 to the Trust Account for the benefit of Supplier-1 and Supplier-2.

Execution of Search Warrants and Interviews

44.     On April 17, 2020, the FBI executed a search warrant[13] at the Office and

conducted voluntary interviews with Supplier-1 and Supplier-2.  At the same time, the FBI

executed search warrants at the Rancho Cucamonga Warehouse and the LA Warehouse.[14]

45.     The search of the Office revealed, among other things, that most of the

approximately 120 boxes in the living room and back porch were empty.  Most of the empty

boxes had been resealed, shrink-wrapped and labelled, which created the impression that they

were filled with protective masks.

---

[13]     On April 15, 2020, the Honorable Jean Rosenbluth, United States Magistrate Judge, Central District of California, approved a search warrant for the Office, 20-MJ-1680.

[14]     On April 16, 2020, the Honorable Michael R. Wilner, United States Magistrate Judge, Central District of California, approved search warrants for the Rancho Cucamonga Warehouse and the LA Warehouse, 20-MJ-1681 and 20-MJ-1682.

46.     During their execution of the search warrant at the Rancho Cucamonga Warehouse on April 17, 2020, FBI Special Agents discovered only approximately 33,305 3-Ply Masks.  This quantity of 3-Ply Masks represented less than 1.5% of the 2.5 million 3-Ply Masks that Supplier-1 had falsely informed Investor-2 that he had under contract and available for Investor-2's purchase on April 16, 2020, and was also significantly less than the approximately 500,000 3-Ply Masks that UC-1 was told were in the boxes that he was shown at the Rancho Cucamonga Warehouse on April 14, 2020.

47.     Additionally during the execution of the search warrant at the Rancho Cucamonga Warehouse, FBI Special Agents interviewed two individuals present at the Rancho Cucamonga Warehouse about the 3-Ply Masks.[15]  The individuals stated that the Rancho Cucamonga Warehouse was a single open warehouse and that, contrary to what UC-1 had been told on April 14, 2020, there was no separate locked area.  The individuals further advised that: (i) they were responsible for documenting deliveries and pick-ups of any 3-Ply Masks located at the Rancho Cucamonga Warehouse; (ii) the 3-Ply Masks were owned by a Chinese company; and (iii) these individuals had no knowledge of Supplier-1, Supplier-2 or ICIG.

48.     FBI Special Agents also recovered approximately 1.3 million 3-Ply Masks pursuant to their execution of the search warrant at the LA Warehouse on April 17, 2020.  Incident to that search, FBI Special Agents interviewed the owner of the LA Warehouse (the "Warehouse Owner").   The Warehouse Owner stated that he owned the 1.3

---

[15]     The agents conducted the interviews with the assistance of a warehouse employee who served as an interpreter.

Million 3-Ply Masks and that he did not have a contract or agreement with ICIG or Supplier-1 and Supplier-2 regarding the purchase of the 1.3 million 3-Ply Masks. The Warehouse Owner further stated that approximately 700,000 of the 1.3 million 3-Ply Masks in the LA Warehouse had recently been sold to a third party.

### YOUNG and UC-2 Discuss a Price-Gouging Arrangement

49.     On or about March 26, 2020, an FBI Special Agent acting in an undercover capacity ("UC-2")[16] sent an email to the defendant WILLIAM YOUNG, SR. stating, in relevant part: "Our friend told me that you have some ways for us to make money off of this Coronavirus thing. Please email me any information/ideas that you have and let's plan on chatting tomorrow. Great to reconnect with you and look forward to hearing of lucrative opportunities." Based on the investigation, I understand the reference to "[o]ur friend" to be Investor-1. On or about March 27, 2020, YOUNG replied to UC-2, indicating that he did not wish to do business with UC-2 based on his belief that UC-2 "ripped me off the last time" and stating "I want nothing to do with you or any of you do [sic]."

50.     Subsequently, on April 21, 2020, at approximately 9:55 a.m., the defendant WILLIAM YOUNG, SR. communicated via text message to Investor-1, who was located in the Eastern District of New York. YOUNG indicated, in sum and substance, that he was wrong about UC-2 and tried to interest Investor-1 in "2M in US 3 ply Face Mask Respirators .80 plus them." Investor-1 then asked YOUNG if YOUNG had sent this information to UC-2, to which YOUNG responded "Yes I let him know before you."[17]

---

[16]     At all relevant times to this Complaint, UC-2 was located within the Eastern District of New York.

[17]     I believe that UC-2 did not receive a text message from YOUNG because YOUNG did not have a current telephone number for UC-2 when he sent the message.

51.     On or about April 21, 2020, UC-2 sent the defendant WILLIAM YOUNG, SR. a text message indicating, in sum and substance, an interest in any transaction YOUNG might be preparing.

52.     After exchanging a series of text messages, the defendant WILLIAM YOUNG, SR. spoke by telephone with UC-2 on April 21, 2020, at approximately 6:23 p.m. At the call's outset, YOUNG apologized to UC-2 and indicated YOUNG's belief that it was not UC-2, but someone else who had cooperated with the authorities.

53.     Later in the same call, the defendant WILLIAM YOUNG, SR. indicated that he had "masks for sale everybody is looking for" including "2 million masks right now in LA." YOUNG further outlined a procedure for placing money into an "attorney trust" and indicated that the attorney would act as the "paymaster." Based on the investigation and a later reference in this call, I believe that the attorney to whom YOUNG was referring was the defendant KENT BULLOCH.

54.     During the same call, the defendant WILLIAM YOUNG, SR. indicated that he was adding $0.04 to 3-Ply Masks that were selling for $0.80 per mask and that for the "big one, the Covid 95," "they" were charging $3.90 plus 10% commission. Based on the investigation, I believe YOUNG was referring to charging $3.90 for each KN95 Mask plus a commission.

55.     Subsequently in the same call, the defendant WILLIAM YOUNG, SR. described the benefit of placing the funds in the defendant KENT BULLOCH's Trust Account, and suggested to UC-2 that UC-2 might use any profits from the sale of masks to reinvest in a gold-based investment in which BULLOCH and YOUNG offered a 100% return on investment.

56.     Later in the call, UC-2 indicated that there was a substantial demand for masks in New York and UC-2 could make a "financial killing on this."  The defendant WILLIAM YOUNG, SR., stated "I don't care what you charge. I'm just telling you $0.80 is what it costs."  Subsequently, UC-2 discussed the KN95 Masks and stated: "So, what I'm going to do is, so these are $4.10, I'm going to flip these, right, I'm gonna add another 2, 3 dollars onto, onto those."  YOUNG responded "Do whatever you want.  Yeah."

57.     UC-2 and the defendant WILLIAM YOUNG, SR. (referred to below as "WY"), then had the following exchange:

UC-2   We'll get on the same page, but listen, the only thing, that, I don't want my, I don't want my name on any invoices or anything like that.

WY:    Not a problem.

UC-2:  You know what I mean?  Be, because, you know, FEMA --

WY:    That's why we use Kent's attorney trust.  Kent, is the attorney trust. He takes care of the disbursement of all the funds.  So you, so you understand, there is nothing on the invoice.  They're buying it from Kent, the attorney trust, the sellers [UI].[18]  He's the attorney for the seller. So, I don't care, your name doesn't have to appear anywhere except on the payment slip to Kent.  And that's between you and him, and nobody else.

UC-2:  Good. Because --

WY:    UI  --  nobody else knows what I get.  [UI]  That's why I put everything through the attorney trust.  And that's why you, you understand, it's, uh, when you do it the right way, and the reason I use California, unlike all the other states, New York, Florida, all these other places where it's a misdemeanor, it's 5 years in jail if they fuck up.

UC-2:  Yeah.  That's awesome.  Ah, but you've structured, you've structured this very nice.  And, and listen, like you said, please don't put my name on anything, because I know, you know, like I said, I know FEMA and

---

[18]     The term "UI" denotes a portion of the recorded conversation that was partially or wholly unintelligible to the individual transcribing the conversation.

New York right now [UI] everybody's busting everybody for this price gouging, and hoarding and stuff. And I've, I've been swimming in these stock ocean waters for way too long, and, and, and stayed out of jail. So, keep me out of jail. I don't want my name on anything. But I want these masks, and I want to flip them quick, because I can make a killing.

WY:   We're all in the same boat.

<u>Electronic Communications between UC-2 and the Defendants<br>Regarding the Price-Gouging Arrangement</u>

58.   On or about April 21, 2020, at approximately 5:54 p.m., the defendant WILLIAM YOUNG, SR. sent an email message to UC-2, copying the defendant KENT BULLOCH, with the title "[Suppler-1] Mask Deal "Bullock's [sic] Wells Fargo." The email provided bank account information for a bank account held in the name of "Law Office of Kent Bulloch, Esq." The email also provided contact information for BULLOCH and YOUNG. Based on the investigation, I am aware that the bank account in the email for which YOUNG provided information is the Trust Account.

59.   On or about April 22, 2020, at approximately 10:11 a.m., the defendant WILLIAM YOUNG, SR., sent an email message entitled "[UC-2] numbers" to UC-2, copying the defendant KENT BULLOCH. That email provided the following information:

1M in US KN95 Face Mask Respirators:
Kent payment mask total:
$3.80 + 0.38 = 4.18 per Mask
$4.18. × 1,000,000. = $4,180,000.
Commission:
$.418 × 1,000,000. = $418,000.
$418,000. ÷ 5 = $83,600. / spot / masks
you have 2 spots $83,600 × 2 = $167,200 / mask to you
With rolls and extensions at this price
_____
2.5M in US 3 ply Face Mask:
Kent payment mask total:
$.80 + 0.04= .84 per Mask

- 22 -

$.84 × 2,500,000. = \$2,100,000$
Commission:
$.04 ÷ 2 = .02$ / group / mask
$.02 × 2,500,000. = \$50,000.$ / group
On the small where we only have two groups so you take care of your poop and I take her mind [sic].

Based on the investigation to date, I believe that YOUNG was proposing the sale of KN95 Masks and 3-Ply Masks to UC-2. I believe YOUNG was indicating that price for the KN95 Masks would be $4.18 per mask, following a 10% mark-up, and that the price for the 3-Ply Masks would be $0.84 per mask, after a 5% mark-up. I further believe that YOUNG was proposing how the commission would be split on the sales. Based on the investigation to date, I am aware that $4.18 per KN95 Mask and $0.84 per 3-Ply Mask represents a 300% to 400% increase in prices of these items as compared to their price in the market prior to the COVID-19 pandemic.

60.     On or about April 22, 2020, at approximately 11:09 a.m., UC-2 sent an email to the defendant WILLIAM YOUNG, SR., copying the defendant KENT BULLOCH. That email attached a spreadsheet (the "Spreadsheet"). In the Spreadsheet, UC-2 identified potential earnings to UC-2 and the defendants WILLIAM YOUNG, SR. and KENT BULLOCH, assuming that the KN95 Masks were purchased at $3.80 and re-sold at prices ranging from $5.70 to $6.50. The Spreadsheet included columns with the headers "Profits" and "10%," "10%," and "80%." Underneath each of the "10%" columns were the names "Bill" and "Kent," respectively, and UC-2's name was under the "80%" column." The Spreadsheet reflected how much profit YOUNG and BULLOCH would earn on the sale of each KN95 Mask at each price point, in $0.10 increments, between $5.70 and $6.50. For example, if the KN95 Masks were resold for $5.70 each (at a profit of $1.90 each), YOUNG

and BULLOCH would earn $0.19 per KN95 Mask.  Alternatively, if KN95 Masks were

resold for $6.50 each (at a profit of $2.70 each), YOUNG and BULLOCH would earn $0.27

per KN95 Mask.

       61.    The Spreadsheet contained a second page, which reflected the purchase

and re-sale prices of the KN95 Masks based on an assumption that 1,000,000 KN95 Masks

would be purchased and resold.  The Spreadsheet reflected that the costs of purchasing the

KN95 Masks at the offered price of $3.80 would be $3.8 million and that the money earned

from the re-sale of those masks, using the same variable price points in $0.10 increments,

between $5.70 and $6.50, would be between $5.7 and $6.5 million.  The second page of the

Spreadsheet again included columns with the headers "Profits" and "10%," "10%," and

"80%."  Underneath each of the "10%" columns were the names "Bill" and "Kent,"

respectively, and UC-2's name was under the "80%" column."  The Spreadsheet reflected

how much profit YOUNG and BULLOCH would earn on the sale of each KN95 Mask at

each price point, in $0.10 increments, between $5.70 and $6.50.  For example, if the

1,000,000 KN95 Masks were resold for $5.70 each (at a profit of $1.90 each), YOUNG and

BULLOCH would earn $190,000.  Alternatively, if KN95 Masks were resold for $6.50 (at a

profit of $6.70 - $3.80= $2.70), YOUNG and BULLOCH would earn $270,000.


### April 22, 2020 Call Between UC-2 and the Defendants

       62.    On or about April 22, 2020, at approximately 11:47 a.m., UC-2 placed a

call to the defendant WILLIAM YOUNG, SR.  At the outset of the call, YOUNG indicated

his frustration that UC-2 had not wired funds to the defendant KENT BULLOCH's Trust

Account, noting that he had lost 40 million masks in the past week because buyers delayed in sending funds and the mask were sold to other buyers.

63. UC-2 indicated that UC-2 was interested in the "3-Plys" but that UC-2 first wanted to take the "N95s, because those are the, those are the hottest ones that everybody wants." Based on the investigation, I believe that UC-2 was referring to the KN95 Masks about which UC-2 had previously corresponded with the defendants WILLIAM YOUNG, SR. and KENT BULLOCH.

64. At this point in the conversation, the defendant WILLIAM YOUNG, SR. added KENT BULLOCH to the call. BULLOCH introduced himself to the UC-2, stating "[t]his is Kent Bulloch, nice to meet you." YOUNG then noted "And Kent read you[r] email." The UC-2 asked "And Kent, did you get the email?" and BULLOCH responded affirmatively. Based on the investigation, I believe that the "email" being referred to was the email described in paragraphs 60-61 above, that was sent shortly before the call, attaching the Spreadsheet.

65. Subsequently in the call, the defendant WILLIAM YOUNG, SR. again explained that masks were being sold quickly and that "We bought over 20 million in masks for clients that didn't fulfill their obligation. I told him why I was that frustrated with him [UC-2] earlier." The defendant KENT BULLOCH subsequently stated:

> [W]hat's happening out there is that, I think, is that people are starting to read the writing on the wall and realizing there's going to be a real shortage of masks. They cannot make the number of masks they're going to need, because Americans need to get back to working and there's just no way, uh -- the production level is set up for ya know 1% of what we're going to need. So people are starting to realize that there's a real profit to be made and they're jumping on it so fast that for us to get in line, what we need is be able to say -- show proof of funds and then pay the moment the masks uh arrive,

you know, pay for and collect the masks, distribute, and as long as we do that, we can get, you know, a very large supply of masks.

66.     As the conversation continued, UC-2 stated

Kent like I was saying, I ya know I live in New York, and, you know, the governor, you know, now, you know, he's requiring everybody -- and this is probably all over the country -- everybody to wear these masks and stuff like that.  So, this is -- I know these things are scarce.  These things are being snapped up.  And I just see this as an opportunity -- I'm not, I'm not -- I'm going to come through for you guys, because I see this as an opportunity for me to make a tremendous amount of profit[…].

67.     Approximately ten minutes into the telephone call, UC-2 and the defendants KENT BULLOCH and WILLIAM YOUNG, SR. discussed the Spreadsheet that UC-2 had emailed to YOUNG and BULLOCH.  YOUNG indicated that he could not open the Spreadsheet.  BULLOCH indicated that he had reviewed "the breakdown on numbers" and that "it looked fine to me."  Based on the context of the conversation, I believe BULLOCH was indicating he had reviewed the numbers contained in the Spreadsheet.

68.     UC-2 then again indicated that UC-2 wanted to secure a "million" of "KN95s."  Based on the investigation, I believe UC-2 was referring to purchasing 1 million KN95 Masks.  UC-2 further indicated that UC-2 had buyers "in the Brooklyn area," including "a couple of factories over there that will buy them from me, right now for $5.70."  UC-2 further stated "[L]ike I said, I can get rid of these things at $5.70.  So, basically, if I ya know buy a million at $3.8 million, I sell them at 5.7, that's $1.9 million in profit."

69.     UC-2 then inquired whether the defendant KENT BULLOCH would serve as a "paymaster" not only for the initial $3.8 million purchase of the KN95 Masks, but also for the sale of the KN95 Masks from UC-2 to his purported clients.  BULLOCH responded "That's certainly possible."

70.    UC-2 and the defendants WILLIAM YOUNG, SR., and KENT

BULLOCH (referred to as "KB" below) then had the following exchange:

UC2:    So, in that case, so in that case, it's the 1.9 million [$1.9 million], if I turn these right around for five -- and then I, I was just proposing that Bill gets 10% of the profit. Kent, for your, what you are doing as the paymaster, you get 10%, and then I get the 80%. So you each would get $190,000, uh.

WY:    That works. (Chuckles.)

KB:    Yes, that's fine.

UC2:    So you'd get, you'd each get the and then I'd get when you pay it out, you'd pay -- I make $1.5 million, but you would pay me out $5.3 million, because, you know, I fronted the $3.8 million, plus my profit.

71.    UC-2 and the defendants WILLIAM YOUNG, SR., and KENT

BULLOCH, then had the following exchange:

UC2:    So I'm selling it from $5.70 a mask. I want to very careful and I -- can you send me an invoice saying that I purchased -- that you sold them, that somebody sold them to me for $5.60?  Because I don't want it, I don't want it to look like I'm gouging or anything like that. I want, I only want it to look like I'm making $0.10 on each mask, so is it -- can I get an invoice?

KB:    Uh, the thing is, we can make those invoices and send you invoices just but -- I mean, $0.10 is probably -- you should probably do, be doing like $0.21 or something like that per mask.  Um, which still is not price gouging.  Um, when you're not doubling the price, you're well within the realm of a legal argument.  But I--I'm happy to do that.  But I also want to raise a separate issue.  You have to be really careful in the distribution of these masks, because the federal government will come and accuse you -- if you make one penny per masks, because they want to confiscate the masks. So --

UC2:    Right.

KB:    -- so if you gotta, if you have to show that invoice to somebody, you already got a bigger problem than you are probably going to be able to handle.  Just so you know.

- 27 -

Type text here

Based on my training and experience and the investigation, I believe that BULLOCH was

indicating that the KN95 Masks that were being discussed could be confiscated by the federal   Type text he

government because of existing shortages of PPE.  I further believe that in response to UC-2's

request for invoices that would hide the price gouging conduct he was proposing (re-selling

KN95 Masks purchased for $3.80 per mask at $5.70 per mask), BULLOCH was indicating a

willingness to send UC-2 invoices that did not accurately reflect the purchase price ("we can

make those invoices and send you invoices").

> 72.    Following additional discussion, the defendant KENT BULLOCH again

reiterated "I'm happy to make it for whatever, because it really doesn't matter to us. It's just

an invoice."

> 73.    UC-2 and the defendants WILLIAM YOUNG, SR., and KENT

BULLOCH then had the following exchange:

UC-2    So, Kent, the other thing, if I can [UI] of you, um.  Ya know with the
        buyers that I have lined up right now, that I'm gonna to flip them to for
        [$]5.70, um, can you, can you just do me like a generic letter saying
        that you, ya know you're the, you know -- because I want them to
        know that they are going to send the funds for the purchase direct to
        you.  Can you do some kind of generic letter saying, send, you know,
        remit funds, whatever, and, and for your wire instructions and then, and
        then say something like, um, you know uh, disbursements of ya know
        ten no more than $0.10 or something like that?  Something like that, no
        more than $0.10 will be, you know, paid for logistics and finance or
        something like that, just so, they know, where to send the money and
        they don't, they don't think I'm, you know, making a shitload of
        money on this thing.

KB:     Right.  No I get it. I get it.  You are trying to protect yourself with, and,
        um. Uh I – we'll work something out on that.  And, um, I'll get you
        something on that.  I have to kind of think about how I want to phrase
        it, because I don't want to create exposure for myself either, but I'll do
        something along those lines.

WY:     What -- what about just doing it -- a generic saying, I have the masks

> that are available, invoice that are available to be purchased that -- and here is my IOLTA account, everything must go through the account, accounts.  Everything must be present in the account before [masks] are disbursed.

KB:     It -- it's more if [UC-2] wants to put down that, that um, that basically [UC-2 is] trying to be able to say to people, look, I'm not making more than 10% on this, because, you know that um – so it needs to say that the masks won't have a more than a 10% uh markup to cover costs. Um something to that effect.

UC2:    Right.

KB:     So that [UC-2 has] got the ability to say, look, heh, I'm making a little bit of money on this, but I'm not, I'm not, uh you know, making a ton.

UC2:    I don't, I don't want them to know I'm making a killing here is basically it.

KB:     Yea no I get it.

UC:     Because that would be red -- that would be a red flag.

KB:     Yeah. Exactly. And the thing is that we don't want any red flags for you, because the truth is that um any red flags for you, will be red flags for us --

WY:     -- for us (chuckles)

KB:     -- and, and I don't look good in orange.  I got nice pinkish skin. (Laughs.)  I don't need, I don't need orange to clash with it.

Based on my training and experience and the investigation, I believe that BULLOCH was agreeing to UC-2's request to create an escrow agreement that UC-2 could provide to prospective buyers that would falsely indicate that UC-2 had not increased the price of the KN95 Masks excessively ("so it needs to say that the masks won't have a more than a 10% uh markup to cover costs. Um something to that effect").  I further believe that BULLOCH was acknowledging that documentation that demonstrated a substantial cost mark-up would potentially create problems with law enforcement ("the truth is that um any red flags for you,

- 29 -

will be red flags for us" and "I don't look good in orange").  I believe the reference to not looking "good in orange" was a reference to the orange jumpsuits often warn by incarcerated individuals.

The Transmission of the Escrow Agreement

74.     On or about April 22, 2020, at approximately 2:21 p.m., approximately two and a half hours after the call between UC-2 and the defendants WILLIAM YOUNG, SR., and KENT BULLOCH, BULLOCH sent UC-2 an email entitled "escrow agreement," which stated "Here is what you asked for.  Just inserted some verbiage in my existing escrow contract."  Attached to the email was a document entitled "Escrow Agreement [UC-2]" (the "Escrow Agreement")

75.     The Escrow Agreement identified the defendant KENT BULLOCH as the "Escrow Agent" and identified UC-2 as the "Client."  It further indicated that it was an agreement between BULLOCH and UC-2 and provided information for BULLOCH's Trust Account.  The document was five pages in total and provided signature blocks, dated April 22, 2020, for BULLOCH and UC-2.

76.     The Escrow Agreement further included the following language:

**PURPOSE OF THIS ESCROW:**  The Client has entered into various sales agreements for the sale of Anti-Viral Face Masks.  Each contract shall be lodged with the Escrow Agent, with specific instructions for cash disbursement.

**Client** understands that no more than 10% shall be allocated above costs for resale of masks.  Client shall not charge more than 10% above costs to secondary buyer.  For example if masks cost $5.50 clent [sic] will not resale masks above $6.05.

Based on the investigation to date, I believe that the provision that represented that the "Client," defined in the Escrow Agreement as UC-2, would not "charge more than 10% above

costs to secondary buyer" reflected the defendant KENT BULLOCH's effort to fraudulently

assist UC-2 by falsely claiming to potential buyers of KN95 Masks that the UC-2 would not

earn more than 10% on the re-sale of the KN95 Masks.

77.     On or about April 22, 2020, at approximately 2:41 p.m., the defendant

WILLIAM YOUNG, SR. sent an email message to UC-2, copying the defendant KENT

BULLOCH.  The email provided bank account information for the Trust Account held in the

name of "Law Office of Kent Bulloch, Esq."  The email also stated "1M in US KN95 Mask

Respirators" and further stated "KENT Mask Payment is: Percent of net.  Net is defined as

total money from final sell [sic] of goods less cost of products."  The email also stated

"Payment names listed below:" and identified 10% for BULLOCH, 10% for YOUNG and

80% for UC-2.

78.     On or about April 22, 2020, at approximately 3:11 p.m., UC-2 sent an

email to the defendant KENT BULLOCH acknowledging receipt of the Escrow Agreement.

79.     On or about April 22, 2020, at approximately 6:07 p.m., the defendant

WILLIAM YOUNG, SR., wrote an email to UC-2, copying the defendant KENT

BULLOCH.  The email asked "how are we looking for closing tomorrow do you need

anything from me to Kent [?]"  Shortly thereafter, at approximately 9:46 p.m., UC-2 replied

"Received your email with our percentages.  Received the escrow agreement from Kent.  I

will execute the agreement and send back tomorrow."  UC-2 further indicated UC-2's intent

to wire $3.8 million to "Kent's escrow" by "no later than Friday [April 24, 2020]."

80.     On or about April 23, 2020, at approximately 9:12 a.m., UC-2 sent an

email to the defendants WILLIAM YOUNG, SR. and KENT BULLOCH, attaching a signed

copy of the Escrow Agreement.  On or about 12:54 p.m., BULLOCH sent an email to UC-2,

copying YOUNG, returning the Escrow Agreement signature page with BULLOCH's signature included.

81.     On or about April 27, 2020, UC-2 sent a text message to the defendant WILLIAM YOUNG, SR. representing that, in sum and substance, the wire transfer of funds for the masks had been blocked and that UC-2 could not provide the requested funds.  Shortly thereafter, YOUNG responded with a text message to UC-2, stating "This mask world is not where we make our money is there for some reason we should all be this please let me know what did you hear. We're only to this to help out friends."   Based on the investigation, I am aware that YOUNG has frequently sent text messages that appear to have errors which reflect the "auto correct" function that exists on many text messaging applications.  Here, the meaning of YOUNG's message is unclear to the affiant.

82.     Because public filing of this document could result in a risk of flight by the defendants KENT BULLOCH and WILLIAM YOUNG, SR., also known as "Bill," as well as jeopardize the government's ongoing investigation, your deponent respectfully

requests that this complaint, as well as any arrest warrants issued in connection with this

complaint, be filed under seal.


Dated:   Brooklyn, New York
         April 27, 2020




_____
WILLIAM BOLINDER
Special Agent
Federal Bureau of Investigation



Sworn to before me this
27th day of April, 2020


_____
THE HONORABLE CHERYL L. POLLAK
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK